FILED

12/02/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 19, 2021

**STATE OF TENNESSEE v. CARL DWAYNE PRINCE**

**Appeal from the Circuit Court for Robertson County**
**No. 74CC4-2018-CR-796      Jill Bartee Ayers, Judge**

_____

**No. M2020-01302-CCA-R3-CD**

_____

The defendant, Carl Dwayne Prince, appeals his Robertson County Circuit Court Jury conviction of aggravated assault, arguing that the trial court erred by finding a valid waiver of the right to counsel and permitting him to proceed pro se, that the evidence was insufficient to support his conviction, and that the State's failure to disclose certain evidence violated due process principles as announced in *Brady v. Maryland*, 373 U.S. 83 (1963). Because the trial court failed to conduct a sufficient inquiry to support a finding that the defendant effectuated a valid waiver of the right to counsel, the defendant is entitled to a new trial. Because the evidence was insufficient to support a conviction of aggravated assault but sufficient to support a conviction of simple assault, the judgment of the trial court is reversed, and the case is remanded to the trial court for a new trial on alternative counts of assault involving bodily injury and assault by offensive touching.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Reversed and Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Sarah R. King, Ashland City, Tennessee (on appeal); Dan Dalrymple, Assistant District Public Defender (at sentencing and as elbow counsel at trial); and Carl Prince, pro se (at trial), for the appellant, Carl Dwayne Prince.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; John W. Carney, District Attorney General; and James Winn Milam, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Robertson County Grand Jury charged the defendant with alternative counts of the aggravated assault of Steven Robinson on August 19, 2018.

At the April 2019 trial, the victim testified that on August 19, 2018, he was moving from property that belonged to his brother-in-law, John Parker, to a property owned by his grandparents because, due to unnamed grievances, he and Mr. Parker had come to the mutual decision that the victim should move. The defendant, who, like the victim, worked for Mr. Parker, arrived while the victim and his girlfriend, Brandy Johns, were moving the victim's belongings onto a truck and trailer. The victim said that although the defendant had accused the victim of stealing some tattoo equipment several months prior, the two men had had no difficulties immediately before August 19, 2018. Nevertheless, on that date, the defendant pretended like he was going to help the victim move but instead "turned around and struck me." The victim recalled that the defendant struck him "open-handed . . . which knocked me back and . . . the only reason the fight stopped was [Chris] Willis coming up and grabbing him off me to make sure I didn't get any more hurt than I already was."

The victim testified that the defendant struck him "a little over twenty different times" as the victim "ducked my head and guarded it with my arms as much as I could." He said that he did not see anything in the defendant's hand but that "it felt like" the defendant had something in his hand when he struck the victim's face. The victim identified "the bracket out of the tip of a Sawzall" as the item the defendant "grasped in the palm of his hand . . . as he hit me." The victim agreed that the shape of the item matched the injury to his face. The victim said that he did not see the object until he "had gotten up and kind of gotten my thoughts back together." At that point, the victim's girlfriend pointed out the item, which lay "on the porch, right where he had struck me." The victim insisted that the item had not been on the porch while he and his girlfriend "moved the first truck out of the place." He said that his girlfriend gave the object to the Robertson County Sheriff's Department.

The victim adamantly denied having placed his hand or any other part of his body on the defendant's buttocks. He said that he was not sexually attracted to men in general or the defendant in particular. The victim testified that although Ms. Johns, Mr. Parker, and Mr. Willis were present, he did not know whether any of them witnessed the assault in its entirety. After striking the victim, the defendant "walked up towards his vehicle, shouting to them about something and he got into his vehicle and left before I could stand up and fully actually move." The victim said that his wounds bled and "hurt profusely." After cleaning his face and clearing his head, the victim went to the Lennox Avenue location where he was moving. Police and emergency medical personnel came to the Lennox Avenue location. The victim said that he suffered a broken nose and bruising above his eye as a result of the blow struck by the defendant. He added that, as a result of the injury, he suffered chronic sinus issues and migraine headaches.

-2-

During cross-examination, the victim acknowledged that he continued to move furniture out of his old residence and into his new residence after receiving the injury. He also acknowledged that he had used a Sawzall before and knew how to assemble and disassemble that piece of equipment but said that he had never owned a Sawzall despite having worked as a carpenter for years. The victim admitted that he had consumed one large beer on the day of the offense.

Brandy Johns testified that she had been romantically involved with the victim for approximately three years and that she was living with him on the day of the offense. She recalled that she was helping the victim move his belongings from Mr. Parker's property when the defendant arrived "and said I see you are letting your old lady do all the moving?" She said that she walked into the house "to get some more stuff to come out, and I hear a big old kabang outside the door." When she got outside, she saw the defendant on top of the victim, "kicking him, hitting him and I noticed that there was something like metal sitting on the ground next to him which I know for a fact was not there in the first place." At that point, Ms. Johns "screamed and that's when" Mr. Willis "flew over the little gate and landed on top of" the defendant "to get him off of" the victim. She did not see anything in the defendant's hand as he continued to strike the victim while the victim lay on the ground. After Mr. Willis intervened, the defendant "went back to his van and sped off" without comment.

Ms. Johns said that the victim's "whole face was covered in blood." Ms. Johns testified that, rather than call 9-1-1 immediately, she "wanted to get out of that location," so she "took the victim to the new location, which is just right down the road." Ms. Johns said that she retrieved the metal item from the floor of the porch, reiterating that the item had not been there before the defendant's arrival, and "threw it in my truck." She later provided it to the police.

Ms. Johns testified that, to her knowledge, the only disagreement between the defendant and the victim had occurred "two months prior" to the attack. On that occasion, the defendant came to the victim and accused him of taking "some tattoo stuff." She recalled that the defendant said "if I ever catch you out, your ass is mine."

During cross-examination, Ms. Johns conceded that she had moved out of the "slight apartment"[1] on Mr. Parker's property on the Friday before the incident and into her mother's home in Rutherford County. She said that she moved out because she

---

[1] Based on the various descriptions provided by the witnesses, it appears that the victim and Ms. Johns, along with Ms. Johns' niece and her great-nephew, were living in an outbuilding adjacent to a chicken coop on Mr. Parker's property. The building had no running water, but Mr. Parker allowed the occupants to use the outside running water and to enter the main house to use the water there as well.

"couldn't handle [Mr.] Robinson's drinking." She insisted, however, that the victim did not consume any alcohol before the defendant attacked him.

Robertson County Emergency Medical Services Paramedic William West responded to the 9-1-1 call at 10:19 a.m. When he arrived, he observed that "the victim had an injury to his face, cut on the bridge of his nose and an obviously fractured . . . nose." Mr. West opined that a closed fist would not have caused the victim's injuries, saying, "It had to be some type of object."

During cross-examination, Mr. West testified that the victim refused to be transported to the hospital by ambulance and that he signed on the computer saying as much. Mr. West recalled that the victim told emergency medical personnel that he had "got assaulted" at another location "when he was struck in the face with some type of pipe object." Mr. West said that he told the victim that he should go to the hospital for treatment of his broken nose, and the victim told him that "he would go later in his own vehicle."

Robertson County Sheriff's Department Deputy James Hall also responded to the 9-1-1 call. He collected the metal item from "the hood of the white vehicle . . . owned by Ms. Johns" that was parked at "the secondary scene." During his investigation, Deputy Hall spoke with Mr. Parker and Mr. Willis but "was told that nobody saw anything. They heard a commotion and once they heard the commotion, they simply saw [the defendant] walk away from the incident, enter his vehicle and drive away from the scene."

Deputy Hall conceded that, in both the summation portion of his case report and the affidavit of complaint, he reported that the victim told him that the defendant struck him with a small piece of metal when he turned to pick up a piece of furniture. He agreed that the victim's version of events had altered slightly but attributed the differences to "the fact that the day that we were there and I took his original statement, he still had a lot of adrenaline flowing" and had just "received [a] traumatic blow to the head." He did not request forensic testing of the metal object provided to him by Ms. Johns because "by the time it got around to me, it had been handled by multiple people."

John Parker, the victim's brother-in-law, testified on behalf of the defendant that, at the time of the offense, the victim lived in a building on his property and worked for him at one time. On the day of the offense, the victim was moving out because Mr. Parker had told him that "he needed to go." Mr. Parker had also fired the victim for failing to show up for work "a lot." Mr. Parker testified that the defendant was trustworthy and that the victim, whom he described as "a colorful individual," had been less than trustworthy in the past. Mr. Parker said that the defendant came to his residence at his request that day and that he did not see the defendant with the small metal object that Ms. Johns had picked up from the porch. Mr. Parker did not witness the incident.

-4-

During cross-examination, Mr. Parker identified the small metal object as a piece from a "[r]eciprocating saw, Sawzall" designed to protect both the user and the object being cut by the saw blade. He said that the object "is something that would . . . probably be around my shed. There's all kinds of tool parts."

During redirect-examination, Mr. Parker said that he did not see the defendant pick that or any other item up on the day of the offense.

Based upon this evidence, the jury convicted the defendant as charged. The trial court merged the jury verdicts into a single conviction of aggravated assault and, following a sentencing hearing, imposed a sentence of 10 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant asserts that the trial court erred by permitting him to proceed pro se, that the evidence was insufficient to support the jury verdicts, and that the State violated the principles of due process announced in *Brady*.

## I. Self-Representation

The defendant first asserts that the trial court should not have permitted him to proceed pro se, arguing that the record does not evince a valid waiver of the right to counsel and assertion of the right to self-representation because the trial court did not apprise him of the nature of the charges against him, the potential punishments, and the dangers of self-representation. The State contends that the record is inadequate for our review. In the alternative, the State asserts that the record supports a finding that the defendant knowingly and voluntarily waived his right to counsel and elected to proceed pro se.

The defendant first expressed a desire to represent himself at his arraignment. Following his request, the trial court asked the defendant whether he had studied law, and the defendant replied that although he was not a lawyer, he had studied the law. He stated that he was "[n]ot that much" familiar with the Tennessee Rules of Criminal Procedure "but I am sure it would be okay." When asked if he was familiar with the Tennessee Rules of Evidence, he replied, "They're uniform aren't they?" The court informed the defendant that "each State is specific," but the defendant insisted that "it is not a complicated case. I believe we can do it." The court advised the defendant to "accept counsel because it does not appear to me that you . . . have the background legally to represent yourself, but if you wish to do that against everyone's advice, then you can move forward in that capacity." The defendant, who was being held in the Robertson County Jail, indicated that he felt compelled to represent himself because "Counsel's got case loads and they get put off for

-5-

months at a time and that place over there is a breeding bed for psychological problems. We don't get no fresh air. . . . [S]o I gotta throw myself under the bus than get put on the back burner."

The trial court reiterated that the defendant lacked familiarity with either the rules of evidence or the rules of procedure, and the defendant responded that "they got a kiosk over there -- a site where you can look up some [r]ules and stuff like that, you know?" He said that he was "familiar enough with the [c]ourt system to pick a jury, if you give me a list of the prospective jurors and a time for me to analyze what is going on, and this is not a settlement case. I am innocent and I would like to take it to trial as fast as I can." The trial court then agreed to allow the defendant to proceed pro se but did not explicitly find that the defendant had knowingly and voluntarily waived his right to counsel.

The court read the indictment, and the defendant immediately inquired into whether the indictment was duplicitous. When the court said that it could not give the defendant legal advice, he asked for the appointment of "stand-by" or "elbow counsel." The court agreed and appointed elbow counsel, explaining that the defendant had "indicated very clearly that he wants to represent himself, but he has demonstrated several times today that he does not know the law and he is going to have questions" and that it was elbow counsel's duty to be "available to answer those questions for you." The court added that should the defendant change his mind, the court would "appoint you full counsel."

A criminal defendant has a right to be represented by counsel or to represent himself and proceed pro se without the assistance of counsel. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 9; *Faretta v. California*, 422 U.S. 806, 819 (1975); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984). "[T]he right of self-representation and the right to counsel are alternative rights. In any particular proceeding, a person may assert one or the other, but not both." *Lovin v. State*, 286 S.W.3d 275, 284 (Tenn. 2009) (citing *State v. Berry*, 141 S.W.3d 549 app. at 573-74 (Tenn. 2004)). To activate the right of self-representation, the defendant must: (1) timely assert the right to proceed pro se; (2) clearly and unequivocally exercise the right; and (3) knowingly and intelligently waive his or her right to assistance of counsel. *State v. Hester*, 324 S.W.3d 1, 30-31 (Tenn. 2010). Tennessee Rule of Criminal Procedure 44 provides that, "[b]efore accepting a waiver of counsel, the court shall:

> (A) advise the accused in open court of the right to the aid of counsel at every stage of the proceedings; and
>
> (B) determine whether there has been a competent and intelligent waiver of such right by inquiring into the

background, experience, and conduct of the accused, and other
appropriate matters.

Tenn. R. Crim. P. 44(b)(1). To facilitate the determination whether the defendant has made "a competent and intelligent waiver," this court has recommended that trial courts rely on the questions set forth "in 1 Bench Book for United States District Judges." *State v. Herrod*, 754 S.W.2d 627, 630 (Tenn. Crim. App. 1988) (citing *United States v. McDowell*, 814 F.2d 245, 251-52 (6th Cir. 1987)).

"[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself." *Godinez v. Moran*, 509 U.S. 389, 399 (1993); *see also State v. Hester*, 324 S.W.3d 1, 31 (Tenn. 2010). "A defendant need not have legal training or experience in order to competently and intelligently elect self-representation." *State v. McCary*, 119 S.W.3d 226, 256 (Tenn. Crim. App. 2003) (citing *Faretta*, 422 U.S. at 835). Indeed, "the defendant's 'technical legal knowledge' is 'not relevant' to the determination whether he is competent to waive his right to counsel." *Godinez*, 509 U.S. at 400. "Deficiencies in legal skills and legal knowledge do not deprive a person of his or her right to self-representation." *Hester*, 324 S.W.3d at 32. The only exception to this general rule, which is not applicable here, exists "for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Indiana v. Edwards*, 554 U.S. 164, 178 (2008). It follows, then, that "when a defendant is apprised of the dangers and disadvantages of self-representation so that 'he knows what he is doing and his choice is made with eyes open,' and yet chooses to proceed pro se, his performance at trial is not relevant as to whether there was a valid waiver made prior to trial." *State v. Northington*, 667 S.W.2d 57, 61-62 (Tenn. 1984) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

Our standard of review of a defendant's exercise of the right of self-representation is a mixed question of law and fact, *see Hester*, 324 S.W.3d at 29, which we review de novo with a presumption of correctness as to the trial court's factual findings, *State v. Holmes*, 302 S.W.3d 831, 837 (Tenn. 2010). "[T]he wrongful deprivation of a criminal defendant's right to counsel is a structural error which so contaminates the proceeding that reversal is mandated." *State v. Holmes*, 302 S.W.3d 831, 838 (Tenn. 2010); *cf. Hester*, 324 S.W.3d at 30 ("An error in denying the exercise of the right to self-representation is a structural constitutional error not amenable to harmless error review and requires automatic reversal when it occurs." (citation omitted)).

The trial court bears "the serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver by the accused." *Von Moltke v. Gillies*, 332 U.S. 708, 723 (1948) (citation omitted).

To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances.

*Id.* at 24 (citation omitted). The "Bench Book" mentioned above provides a list of questions designed to aid the trial court in its inquiry:

When a defendant states that he wishes to represent himself, you should . . . ask questions similar to the following:

(a) Have you ever studied law?

(b) Have you ever represented yourself or any other defendant in a criminal action?

(c) You realize, do you not, that you are charged with these crimes: (Here state the crimes with which the defendant is charged.)

(d) You realize, do you not, that if you are found guilty of the crime charged in Count I the court must impose an assessment of at least $50 ($25 if a misdemeanor) and could sentence you to as much as --- years in prison and fine you as much as $---?

(Then ask him a similar question with respect to each other crime with which he may be charged in the indictment or information.)

-8-

(e) You realize, do you not, that if you are found guilty of more than one of those crimes this court can order that the sentences be served consecutively, that is, one after another?

(f) You realize, do you not, that if you represent yourself, you are on your own? I cannot tell you how you should try your case or even advise you as to how to try your case.

(g) Are you familiar with the [Tennessee] Rules of Evidence?

(h) You realize, do you not, that the [Tennessee] Rules of Evidence govern what evidence may or may not be introduced at trial and, in representing yourself, you must abide by those rules?

(i) Are you familiar with the [Tennessee] Rules of Criminal Procedure?

(j) You realize, do you not, that those rules govern the way in which a criminal action is tried in [this] court?

(k) You realize, do you not, that if you decide to take the witness stand, you must present your testimony by asking questions of yourself? You cannot just take the stand and tell your story. You must proceed question by question through your testimony.

(l) (Then say to the defendant something to this effect): I must advise you that in my opinion you would be far better defended by a trained lawyer than you can be by yourself. I think it is unwise of you to try to represent yourself. You are not familiar with the law. You are not familiar with court procedure. You are not familiar with the rules of evidence. I would strongly urge you not to try to represent yourself.

(m) Now, in light of the penalty that you might suffer if you are found guilty and in light of all of the difficulties of representing yourself, is it still your desire to represent yourself and to give up your right to be represented by a lawyer?

(n) Is your decision entirely voluntary on your part?

(o) If the answers to the two preceding questions are in the affirmative, [and in your opinion the waiver of counsel is knowing and voluntary,] you should then say something to the following effect:

"I find that the defendant has knowingly and voluntarily waived his right to counsel. I will therefore permit him to represent himself."

(p) You should consider the appointment of standby counsel to assist the defendant and to replace him if the court should determine during trial that the defendant can no longer be permitted to represent himself.

*McDowell*, 814 F.2d at 251-52 (quoting Guideline[s] For District Judges from 1 Bench Book for United States District Judges 1.02-2 to -5 (3d ed.1986)). Using these as a template, we examine the proceedings in this case.

When the defendant expressed a desire to waive his right to counsel at the arraignment, he cited his desire to bring the case to trial as quickly as possible as the reason for his decision. The trial court did not address the timing issue with the defendant but proceeded immediately to inquire into his background. In doing so, the trial court asked the defendant if he had studied law, and the defendant replied, "Oh, yes." The trial court did not inquire into the circumstances of the defendant's study of law and did not ascertain his educational background. The record indicates that the defendant did not complete high school and was incarcerated for much of his adult life. The trial court did not ask the defendant whether he had previously represented himself in any other criminal case.

The trial court did not inform the defendant of the nature of the charges against him beyond reading the indictment and did not address any of the potential defenses or lesser included offenses. The trial court did not discuss any potential punishments with the defendant, and specifically did not tell the defendant, a Range III offender, that he faced a prison term of at least 10 years should he be convicted at trial. The trial court asked the defendant whether he was familiar with the rules of evidence and procedure but, after the defendant indicated that he was unfamiliar with both, moved on without warning the defendant that he would be responsible for learning the rules and presenting his case within the rules.

The trial court did not warn the defendant that the trial court would not be able to provide him any assistance in trying the case and did not advise him that, should he

decide to testify, he would be required to ask questions of himself instead of telling his story in narrative form. The court did advise the defendant that it was the court's opinion that he should not proceed pro se due to his unfamiliarity with the law and rules of evidence and procedure. The court did not ask the defendant whether he had made his decision voluntarily and, when the defendant tried to explain why he wanted to proceed pro se, the court indicated that it was "not really interested in all those issues." The trial court appointed elbow counsel to assist the defendant but did not actually make an explicit finding that the defendant had knowingly, intelligently, and voluntarily waived his right to counsel.

The trial court also failed to obtain from the defendant a written waiver of the right to counsel. Rule 44 requires that "[a] waiver of counsel shall be in writing" and that the written waiver must be "in the record." Tenn. R. Crim. P. 44(b)(2)-(3).

To be sure, the defendant performed admirably at trial considering his lack of legal education and is, therefore, to be commended. His performance at trial, however, "is not relevant as to whether there was a valid waiver made prior to trial. A valid waiver, if there is one, is made prior to trial or not at all." *Northington*, 667 S.W.2d 57, 62 (citing *Hsu v. United States*, 392 A.2d 972 (D.C. App. 1978)). "The existence of a constitutional pretrial waiver cannot be made to turn on an appellate court's view as to whether, in retrospect, the defendant used relatively good judgment in representing himself at trial." *Id.* (quoting *Hsu*, 392 A.2d at 986). Based upon our examination of the record, we conclude that the trial court's inquiry into the defendant's desire to represent himself at trial fell short of the kind of "intensive hearing . . . required in order to ascertain that [the defendant] knowingly and intelligently waived his right to counsel and that [the defendant] knew and fully understood the consequences of his decision to represent himself," *Lovin*, 286 S.W.3d at 289, and was more akin to "a mere routine inquiry" of the kind that left the trial court "entirely unaware of the facts essential to an informed decision that an accused has executed a valid waiver of his right to counsel," *Von Moltke*, 332 U.S. at 724. In consequence, the defendant's convictions are reversed, and the case is remanded for a new trial.

## II. Sufficiency

The defendant next challenges the sufficiency of the convicting evidence, arguing that the State failed to establish that the defendant had a weapon in his hand when he struck the victim. The State asserts that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . results in serious bodily injury to another [or] [i]nvolved the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(iii). Serious bodily injury is "bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member." *Id.* § 39-11-106(a)(37). "'Deadly weapon" means . . . [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(6).

Here, the evidence, in the light most favorable to the State established that the defendant struck the victim in the face, breaking his nose. Just after the defendant struck the victim, Ms. Johns found on the floor of the porch a small metal object that had not been there prior to the defendant's striking the victim and the dimensions of which generally aligned to the injury on the victim's face. From this evidence, the jury could have inferred that the defendant used the object to strike the victim. Even examined in the light most favorable to the State, however, the evidence does not support a finding that the that the victim suffered serious bodily injury. This court has specifically held that a broken nose, without more, did not amount to serious bodily injury. *See State v. Sims*, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995). No evidence suggested that the victim suffered from a substantial risk of death, protracted unconsciousness, extreme physical pain, or any disfigurement. Although the victim testified that he suffered "sinus issues" and headaches following the assault, his testimony did not provide evidence from which a jury could conclude that he had suffered the substantial impairment of a function of a bodily member. The evidence was sufficient, however, to support a finding that the victim suffered bodily injury. *See* T.C.A. § 39-11-106(3) ("'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty."). Accordingly, the defendant's conviction of aggravated assault involving serious bodily injury must be modified to a conviction of assault.

Similarly, the evidence was insufficient to establish that the defendant used or displayed a deadly weapon to assault the victim. "[M]any common items have been held to qualify as deadly weapons, but only if the defendant in the particular case used or intended to use the item in a manner that is capable of causing death or serious bodily injury." *State v. McGouey*, 229 S.W.3d 668, 673 (Tenn. 2007). The item at issue in this case, described by witnesses as a bracket for the blade of a reciprocating saw, is an L-shaped piece of metal, roughly three inches by four inches long. The victim said that the defendant struck him with the object one time, breaking his nose. Although the evidence established that the defendant continued to strike the victim, no evidence suggested that he did so with the item in question. There was no evidence that the defendant bludgeoned the victim with the item. In any event, the State presented no evidence of any further injuries inflicted by the object. Under these circumstances, the evidence was insufficient to establish that the metal object in question was used in a manner capable of causing death or serious bodily injury, particularly in light of the fact that the evidence did not support a finding that the victim suffered serious bodily injury.

We are thus left to determine what, if any, lesser included offenses survive our conclusion that the evidence was insufficient to support a finding that the defendant used a deadly weapon. We begin with the knowledge that assault is, by definition, a lesser included offense of aggravated assault. We turn then to the evidence adduced at trial viewed through the lens of the language contained in the indictment. Count 1, which charged aggravated assault by the use of a deadly weapon, contained an allegation that the defendant had caused the victim to suffer bodily injury, suggesting an assault by bodily injury under the terms of Code section 39-13-101(a)(1), and that the defendant had struck, hit, and kicked the victim, actions that would support a finding of assault by offensive touching under the terms of Code section 39-13-101(a)(3). The evidence was sufficient to establish both. We have already concluded that a conviction of the lesser included offense of assault by bodily injury survives in Count 2 of the indictment. Consequently, to preserve the alternative nature of the original charges, we modify the defendant's conviction of aggravated assault by the use or display of a deadly weapon to a conviction of assault by offensive touching.

### III. Brady v. Maryland

Finally, the defendant claims that he is entitled to a new trial based upon the State's failure to timely disclose exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963). He asserts that he did not receive the video recording of the victim captured by the camera in Deputy Hall's patrol car until after his trial despite having specifically requested it and having issued a subpoena for the item. He contends that the video recording contradicts the victim's trial testimony because it shows the victim demonstrating that the defendant struck him with an open hand.

-13-

The constitutional right to a fair trial imposes upon the State "duties consistent with the[] sovereign obligation to ensure 'that justice shall be done' in all criminal prosecutions." *Cone v. Bell*, 556 U.S. 449, 451 (2009) (quoting *United States v. Agurs*, 427 U.S. 97, 111 (1976) (citation and internal quotation marks omitted)). In *Brady v. Maryland*, , the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v Maryland*, 373 U.S. 83, 87 (1963). "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (appendix); *Johnson*, 38 S.W.3d at 56.

> To prove a *Brady* violation, a defendant must demonstrate:
>
> (1) that he requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not),
>
> (2) that the State suppressed the information,
>
> (3) that the information was favorable to the defendant, and
>
> (4) that the information was material.

*Johnson*, 38 S.W.3d at 56 (citing *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995); *Walker*, 910 S.W.2d at 389). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see Johnson*, 38 S.W.3d at 58.

Here, the record establishes that the defendant requested the information but does not establish that the State suppressed the information. At the hearing on the motion for new trial, Deputy Hall testified that he provided the recording to the district attorney's office. Elbow counsel testified that he reviewed the recording with the defendant and that he did so prior to trial. Most importantly, however, even if the video recording was arguably favorable to the defendant, it was not material because its absence from the defendant's trial did not deprive him of a fair trial. Stated differently, there is no reasonable probability that, had the evidence been presented at trial, the result of the proceeding would have been different. The defendant is not, therefore, entitled to any relief on this issue.

## *IV. Conclusion*

Because the trial court failed to conduct an inquiry sufficient to determine that the defendant had knowingly, voluntarily, and intelligently waived his constitutional right to counsel, the defendant is entitled to a new trial. Because the evidence was insufficient to establish that the defendant used a deadly weapon to assault the victim, the conviction of aggravated assault involving a deadly weapon is modified to a conviction of simple assault by offensive touching. Because the evidence was insufficient to establish that the victim suffered serious bodily injury, the defendant's conviction of aggravated assault involving serious bodily injury must be modified to one of simple assault involving bodily injury. Accordingly, the judgment of the trial court is reversed and remanded for a new trial on the alternative charges of assault involving bodily injury and assault by offensive touching.

_____
JAMES CURWOOD WITT, JR., JUDGE

-15-